Dr. Alberto DOMINGUEZ, on his own behalf and on behalf of Eric S. Williams and of Enrique Girod, as salvors,

v.

The SCHOONER BRINDICATE, her tackle, apparel and furniture, and cargo,

and

One Rufus Walters of St. Thomas, V. I.,

and

All persons who may lawfully intervene for their interest in the said schooner, in a cause of possession, civil and maritime.

Quintin LUGO SUAREZ and Antonio Valentin, Libelants,

v.

M/V BRINDICATE II and Rufus Walters, Respondents.

Adm. Nos. 4-60, 5-60.

United States District Court
D. Puerto Rico,
San Juan Division.

May 4, 1962.

Nachman & Feldstein, San Juan, P. R., for proctors.

Hartzell, Fernandez & Novas, San Juan, P. R., for libellants

MAGRUDER, Acting District Judge.

These two cases were consolidated for trial, because they involve competing salvage claims against the same vessel, namely, the Schooner Brindicate II. Though the registered owner of the Brindicate II was served by publication, he did not appear or put in any claim to the vessel. Thereafter, by court order, the schooner was sold by the marshal of the court for the sum of $3,000. The marshal expended $43.75 in connection with the sale so that there is now on hand in the registry of the court $2956.25 to be divided between the competing sets of salvors. This amount is not enough to go around, considering the value of the salvage services as given by the salvors.

The result is that the salvors in Adm. 5–60 are reduced to the necessity of contending that the other group of salvors is entitled to no salvage award at all in view of their membership in the Coast Guard Auxiliary.

■ I think that this contention is wholly unsound. The Coast Guard Auxiliary is a civilian organization administered by the Coast Guard under the direction of the Secretary of the Treasury. 14 U.S.C. § 821. These members of the Coast Guard Auxiliary were not assigned by competent Coast Guard authority to any specific duty with reference to the salvage of this schooner. It may well be that regular members of the Coast Guard cannot claim for salvage operations conducted by them because they could not say that that which was their legal duty to do was a voluntary risking of their safety in salvage operations. It is provided in 14 U.S.C. § 831, reading in part as follows, that:

"No member of the Auxiliary, solely by reason of such membership, shall be vested with, or exercise, any right, privilege, power, or duty vested in or imposed upon the personnel of the Coast Guard or the Reserve, except that any such member may, under applicable regulations, be assigned specific duties, which, after appropriate training and examination, he has been found competent to perform, to effectuate the purposes of the Auxiliary."

It certainly would be contrary to good public policy, and to the wording of the Act of Congress, if members of the Coast Guard Auxiliary, by the mere fact of such membership, would be disentitled to claim a salvage award for services they voluntarily undertook and rendered when they were not acting as members of the Coast Guard by designation from competent Coast Guard authority. This is borne out, I believe, by the regulations covering the Coast Guard Auxiliary to be

found in 33 C.F.R. pp. 7–11 (1949, Supp. 1961 pp. 9–11).

There is no doubt that the Schooner Brindicate II was discovered as a derelict by the two salvors Quintin Lugo Suarez and Antonio Valentin, of Adm. 5–60, on March 16, 1960. This discovery, however, does not give them any priority in the salvage award. When these two fishermen discovered the schooner, a derelict, off the harbor of Aguirre, on the south coast of Puerto Rico, they repaired to the Club Nautico in Aguirre and called the police to report what they had found. The police officer told the salvors to wait, that he was sending an "emissary" to go and tend to the vessel. Thereafter, Mr. Enrique Girod, one of the salvors in Adm. 4–60, appeared. Mr. Girod owned a cabin cruiser about 23 feet long. This motorboat did not thereby become a public vessel, although Girod was a member of the Coast Guard Auxiliary, for the reason that the vessel was never utilized as a public vessel to engage in specific salvage services, so far as any Coast Guard authorities were concerned. 14 U.S.C. § 826.

The caretaker of the yacht club reported the presence of the derelict to Dr. Alberto Dominguez, who brought along with him to the yacht club Mr. Eric S. Williams, who was a patient in Dr. Dominguez' dentist's chair at the time. Dr. Dominguez, Mr. Girod, and Mr. Williams formed a joint venture to salvage the vessel, though they did not file their libel for salvage against the vessel until April 4, 1960.

The two groups of salvors proceeded to the derelict, the first in Mr. Girod's vessel and the second in the fishing boat. There was some conflict on the testimony as to whether Mr. Valentin or Mr. Williams first went aboard the schooner. I am inclined to resolve this conflict in favor of Mr. Williams, for Mr. Girod's vessel was surely faster than the fishing boat and arrived at the scene first. The seas were rough at the time and it was quite a feat to get aboard the schooner. It was conceded by Dr. Dominguez' testimony that from the time Mr. Valentin boarded the schooner, at about 2:30 P.M. until 5:00 P.M. of the same day, he performed some useful and helpful services in connection with the salvage operation. At 5:00 P.M. Mr. Valentin and his companion left, stating that they had some fish on board which had to be sold before it spoiled.

Although the salvors in Adm. 5–60 were not seen again, the schooner after arriving at the port of Aguirre was grounded in the mud and the salvors in Adm. 4–60 had particular difficulty in floating her again. I cannot find evidence of any alleged misconduct on the part of these salvors. The cargo which consisted of bags of cement was a complete loss and had to be dumped to loosen the schooner from the mud where she had become grounded. The three salvors in Adm. 4–60 gave evidence of actual expenses incurred in the salvage operations, which expenses did in fact exceed the fund which is to be distributed. I find it unnecessary to go into the validity of these claims for expenditures as salvage claims, though I am in agreement with counsel for the salvors in Adm. 5–60 that no claims for expenditures should be recognized as valid which postdated the time when the marshal of the United States District Court took charge of the vessel pursuant to the libel for salvage filed by the salvors.

The salvors in Adm. 4–60 state that the court should enter a decree "allowing to the co-salvors Quintin Lugo Suarez and Antonio Valentin a token payment for the assistance they gave during the first few hours of the salvage and which assistance was terminated by them before the vessel was actually safely docked."

I think it would be fair to award to the salvors in Adm. 5–60 the sum of $400.00 for their relatively brief share in the salvage operations, and to award the balance of the amount in the registry of the court to the salvors in Adm. 4–60.

A decree will be entered to that effect.